1

2

3

4

5

6

7                          IN THE UNITED STATES DISTRICT COURT

8                        FOR THE EASTERN DISTRICT OF CALIFORNIA

9    JOHN ALLEN RAINWATER,

10            Plaintiff,                        No. 2:10-cv-1727 GGH P

11        vs.

12   JOHN McGINNISS, Sheriff,                   ORDER

13            Defendant.

14   _____/

15   I.  Introduction

16            Plaintiff is a civil detainee proceeding pro se.  He seeks relief pursuant to 42

17   U.S.C. § 1983.  This case is before the undersigned pursuant to the parties' consent.  Docs. 4,

18   29.[1]  Presently pending is the sole defendant in this case, Sheriff John McGinnis' motion for

19   summary judgment.  Doc. 69.  Plaintiff was deemed a Sexually Violent Predator (SVP) pursuant

20   to the California's Sexually Violent Predator Act (SVPA).  Plaintiff is usually housed at Coalinga

21   State Hospital but was transferred to Sacramento County Main Jail (SCMJ) for court appearances

22   from June 3, 2009, to October 6, 2009.  Plaintiff alleges that his conditions of confinement at

23   SCMJ were unconstitutional as he was only a civil detainee, not a criminal prisoner.  Plaintiff

24   _____

25            [1] In a related case, No. 2:11-cv-0030 GGH P, plaintiff generally raises the same claims
     against the same defendant but during a different time period.  Plaintiff consented to the
26   undersigned in that case, but defendant has yet to choose in that case.

1   describes dozens of different conditions that he deems were unconstitutional based on his status

2   as a SVP detainee.  However, many of plaintiff's allegations are repeated, overlap or are related.

3   Plaintiff then lists fifteen causes of action, though it is not clear which cause of action relates to

4   which claim or claims.

5            Therefore, the court will look to the following claims of unconstitutional

6   conditions:  Custody transfer using handcuffs and restraints, processed with criminal detainees,

7   booked under a penal code section, strip search, provided orange clothing, denial of property,

8   contact with criminal inmate workers, denied food, briefly shared a cell with a criminal detainee,

9   had a cellmate, no shower sandals for eleven days, commissary was expensive, no sex offender

10  treatment, staples and paperclips were confiscated, denial of indoor and outdoor recreation,

11  denial of telephone service, denial of law library access, inadequate medical care, his cell was

12  searched, not promptly given a rule book, laundry not cleaned frequently enough, improper

13  bedding, mail was read by staff, visitation was done behind glass with a phone and visitors

14  received parking tickets.

15  II.  Motion for Summary Judgment

16            Legal Standard for Summary Judgment

17            Summary judgment is appropriate when it is demonstrated that there exists "no

18  genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

19  law."  Fed. R. Civ. P. 56(c).

20            Under summary judgment practice, the moving party

21       always bears the initial responsibility of informing the district court
         of the basis for its motion, and identifying those portions of "the
22       pleadings, depositions, answers to interrogatories, and admissions
         on file, together with the affidavits, if any," which it believes
23       demonstrate the absence of a genuine issue of material fact.

24  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ.

25  P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

26  issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings,

1   depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment

2   should be entered, after adequate time for discovery and upon motion, against a party who fails to

3   make a showing sufficient to establish the existence of an element essential to that party's case,

4   and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.

5   "[A] complete failure of proof concerning an essential element of the nonmoving party's case

6   necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

7   should be granted, "so long as whatever is before the district court demonstrates that the standard

8   for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at

9   2553.

10          If the moving party meets its initial responsibility, the burden then shifts to the

11  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

12  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

13  (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

14  not rely upon the allegations or denials of its pleadings but is required to tender evidence of

15  specific facts in the form of affidavits, and/or admissible discovery material, in support of its

16  contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

17  106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is

18  material, i.e., a fact that might affect the outcome of the suit under the governing law, see

19  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

20  Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

21  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

22  nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

23          In the endeavor to establish the existence of a factual dispute, the opposing party

24  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

25  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

26  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

3

judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

On October 7, 2010, and July 10, 2012,[2] the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

The above advice would, however, seem to be unnecessary as the Ninth Circuit has held that procedural requirements applied to ordinary litigants at summary judgment do not apply to prisoner pro se litigants.  In Thomas v. Ponder, 611 F.3d 1144 (9th Cir. 2010), the district courts were cautioned to "construe liberally motion papers and pleadings filed by *pro se*

---

[2] Plaintiff was reminded of the requirements in light of Woods v. Carey, --- F.3d ----, 2012 WL 2626912 (9th Cir. July 6, 2012), and given an additional opportunity to file evidentiary submissions.  Plaintiff submitted additional evidence (Doc. 95) which the court has reviewed.

1   inmates and ... avoid applying summary judgment rules strictly." Id. at 1150.  No example or

2   further definition of "liberal" construction or "too strict" application of rules was given in Ponder

3   suggesting that any jurist would know inherently when to dispense with the wording of rules.

4   Since the application of any rule which results in adverse consequences to the pro se inmate

5   could always be construed in hindsight as not liberal enough a construction, or too strict an

6   application, it appears that only the essentials of summary judgment, i.e., declarations or

7   testimony under oath, and presentation of evidence not grossly at odds with rules of evidence,

8   need be submitted by the pro se party.

9                    Undisputed Facts

10          The following of defendant's undisputed facts (DUF) are either not disputed by

11  plaintiff, or following the court's review of the evidence submitted, have been deemed

12  undisputed:

13          Plaintiff was convicted for child molestation in 1979 and 1981.  DUF #1.  He was

14  sentenced to 25 years and was released from prison in 1994.  Id.  Pursuant to California Welfare

15  & Institutions Code sections 6600 et seq., plaintiff was deemed a sexually violent predator and

16  transferred to the custody of the Department of Mental Health.  DUF #2.  During the relevant

17  time, plaintiff was housed at Coalinga State Hospital before being transferred to SCMJ.  DUF #3.

18  At the relevant times plaintiff did not have any criminal charges pending and was not serving a

19  criminal sentence.  DUF #5.  Sacramento County Main Jail is a maximum security facility, that

20  houses a wide variety of inmates.  DUF #7.  At maximum capacity SCMJ can hold 2,432 inmates

21  and is often at or near maximum capacity at all times.  Id.  In 2009, there were on average four to

22  six SVP detainees at SCMJ at a time.  DUF #49.  In order to effectively and safely operate the

23  facility, an entire area that normally holds 64 people cannot be shutdown just to hold four to six

24  SVP detainees.  DUF #50.  As a result, other classifications of detainees must be housed in the

25  same area as SVP detainees such as mentally disordered offender inmates.  DUF #53.  An inmate

26  who has a criminal history of sex and violence against children is likely to be targeted by other

inmates.  DUF #54.  In 2009 it was the policy of SCMJ to classify and place SVP detainees and other civil sub-classifications such as mentally disordered offenders in the 3 East area.  DUF #55. This area is the most convenient as well as the least restrictive area of the jail, as it is on the same floor and therefore provides easier access to the law library, social workers and psychiatric services.  DUF #56.

Sacramento County Main Jail has an ongoing battle to stop contraband from entering the facility, such as drugs, guns, weapons, food, pornographic magazines, or alcohol. DUF #8.  Contraband can be transported into the facility either by swallowing it, inserting it into areas of the body or visitors can pass objects at the facility or while at court proceedings.  Id.  It is just as possible for a criminal or civil detainee to smuggle contraband.  DUF #10.  As a result, inmates and their cells are searched.  DUF #11.

On June 3, 2009, plaintiff was transported from Coalinga State Hospital to SCMJ. DUF #80.  Plaintiff packed a bag containing fourteen Efferdent tablets, a carry see-through bag, eyeglass case, electronic dictionary, wrist watch and state issued velcro strap shoes.  DUF #81. Plaintiff was not allowed to bring the following items: Apple iPod, DVD player, Palm PDA and wireless keyboard, Play Station Portable gaming device, DVDs, CDs, SD chips, thumb drives, pens, photo albums, personal food and shoes.  DUF #82.  Plaintiff's staples and metal paperclips were confiscated.  Id.  Plaintiff was placed in handcuffs, a security belly/waist chain and ankle cuffs for the van transportation.  DUF #83.  Plaintiff did not request any stops for a restroom or meal for the approximately three hour trip.  DUF #84, 85.  Plaintiff arrived at SCMJ at approximately 2:24 p.m.  DUF #86.

Upon arriving at SCMJ inmates remain handcuffed while the transporting officer completed paperwork and the booking process.  DUF #19.  The holding tank for the booking process can hold up to fourteen people, though that amount varies.  DUF #87.  Plaintiff's booking sheet cited California Penal Code § 2620 as the reason for his presence at SCMJ.  DUF #88.  Plaintiff did not ask the other individuals at booking why they were at SCMJ.  DUF #90.

1  Plaintiff believes that all the other individuals at booking were criminals because he noticed their

2  booking sheets which listed penal code sections as the reasons for their detention.  DUF #91.

3  Though, plaintiff's own booking sheet indicates a penal code section even though plaintiff was

4  not serving a sentence for a criminal conviction.  DUF #92.

5           Plaintiff was strip searched in that he was required to undress, then bend at the

6  waist while spreading his buttocks to display his rectum, squat naked and cough several times,

7  and lift his scrotum and penis to allow visual inspection.  DUF #94.  Plaintiff was then forced to

8  place his fingers inside his mouth pulling his lips away from the gums while sticking his tongue

9  out and then remove his upper partials for viewing.  Id.  The search was conducted by two male

10 deputies who never physically touched him during the search.  DUF #95, 97.  While there were

11 approximately seven other inmates in the room at the time, plaintiff stood between two metal

12 partitions which obstructed him from view of the other inmates.  DUF #96.  Plaintiff was then

13 given orange clothing the same clothing worn by all individuals except those awaiting transfer to

14 US Immigration and Customs Enforcement, who wear green.  DUF #98.  New inmates received

15 one shirt, one undershirt, one pair of pants, one pair of socks, one pair of shoes, one towel and

16 one complete set of undergarments.  DUF #28.

17          At approximately 4:52 a.m., plaintiff was moved to the 7 East area in the jail

18 where he was placed in a protective custody cell.  DUF #99.  Inmates in protective custody are

19 separated from the general population for their own safety.  DUF #100.  While in 7 East, plaintiff

20 shared the cell with an individual who had just been sentenced after pleading no contest to sexual

21 battery and was awaiting transfer to a state prison facility.  DUF #101.  Plaintiff remained in the

22 cell for five hours until he was moved to 3 East.  Id.  Once plaintiff moved to 3 East, he was only

23 housed or shared cells with other civil detainees.  DUF #102; Plaintiff Undisputed Facts (PUF)

24 #102; Defendant's Reply to PUF #102.

25          Plaintiff takes issue with the fact that he was given orange clothing which did not

26 distinguish him as a civil detainee.  DUF #103.  Plaintiff also takes issue with the fact that the

clothing was ill fitting and he believes the socks were women's socks.  DUF #104.  Plaintiff

claims he did not receive a rule book when he went through the booking process and he did not

receive one until August 10, 2010.  DUF #106.  Plaintiff admits he did not request a rule book

during booking.  DUF #107.

Plaintiff contends he was tortured by the smell of his cellmate defecating and the

sound of his cellmate masturbating.  DUF #108.  Plaintiff states he was subject to mental torture

by the people in the neighboring cell who would frequently push a button to run water through

their sink.  DUF #109.  Plaintiff also states the noise of other inmates yelling or pounding on

their doors caused him mental torture.  DUF #110.  Staff at SCMJ are required to count all

inmates multiple times per day, to ensure all inmates are accounted for.  DUF #58.  When counts

are performed inmates are asked to stand or sit so that staff may see the inmate's face.  DUF #59.

Plaintiff objected that he had to stand up or sit down when staff performed head counts of

inmates and staff threatened to take away his dayroom privileges if he refused to comply.  DUF

#111.  Plaintiff states that for some meals, certain components of the meal were no longer

available by the time he received the meal, such as milk, a piece of fruit or a Kool-Aid packet.

DUF #113.  Plaintiff believes this occurred about three times each week.  DUF #114.  Plaintiff

also did not receive lunch on his arrival at SCMJ on June 3, 2009, at approximately 2:24 p.m,

though lunch had ceased serving already.  DUF #115, 116.

The number of inmates given access to the dayroom varies between one and thirty

depending on the classification of the inmates.  DUF #39.  The dayroom is not utilized twenty-

four hours per day.  DUF #40.  When inmates are using the dayroom no other groups of inmates

are allowed access except inmate workers who need to walk through the area to obtain supplies

for their job or to complete their tasks.  DUF #43, 44.

Plaintiff was housed at SCMJ for 126 days.  DUF #117.  During that time, he had

161 opportunities for dayroom time, which were offered on 111 days of his stay at SCMJ.  DUF

#118.  Plaintiff received an average of 92 minutes per dayroom opportunity.  DUF #119.

1   Criminal defendants received 161 opportunities for dayroom, but these were only offered on 106

2   days and had an average of 82 minutes per dayroom opportunity.  DUF #120.

3           Of the 126 days plaintiff was housed at SCMJ he was given 28 opportunities for

4   outdoor recreation, which were offered on 26 days of his incarceration.  DUF #122.  Plaintiff

5   received an average of 88 minutes of outdoor recreation per opportunity.  DUF #123.  Criminal

6   inmates received 31 opportunities for outdoor recreation, on 30 different days, but criminal

7   inmates received only 62 minutes of outdoor recreation time.  DUF #124.

8           Psychiatric treatment is available to all inmates at SCMJ, including individual and

9   group counseling.  DUF #64.  Plaintiff states that he was not able to continue a Sex Offender

10  Commitment Program (SOCP), that he had been involved with at Coalinga State Hospital.  The

11  SOCP is comprised of multiple components including group therapy, daily journaling, an

12  empathy book, assessments and 24 hour behavior monitoring.  DUF #127.  Plaintiff did not

13  participate in any other group therapy at SCMJ nor did he continue daily journaling.  DUF #128,

14  129.  Though plaintiff did keep a journal unrelated to his SOCP treatment.  Doc. 73, Exh. A:

15  Plaintiff's Deposition at 79.  Plaintiff was not aware of any mental health assessments that he

16  missed at Coalinga State Hospital while he was at SCMJ.  DUF #134.

17          Medical treatment is available for all inmates.  DUF #63.  Inmates are charged

18  $3.00 for a visit, however if the prisoner has no money, they will not be denied medical care.  Id.

19  Plaintiff did not seek treatment after he developed athlete's foot because he did not want to pay

20  $3 for the examination.  DUF #135.  Plaintiff's calcium supplements were replaced with TUMS.

21  DUF #136.  Plaintiff was not provided Coal Tar Shampoo for his psoriasis and Triamcinolone

22  cream for his psoriasis was not provided as often as he wanted.  DUF #137.  Plaintiff could not

23  purchase shower sandals until his first week and they did not arrive until his second week at

24  SCMJ.  DUF #138, 139.  Plaintiff believes the SCMJ commissary is more expensive than at

25  Coalinga State Hospital.  DUF #140.  SCMJ has a commissary which allows inmates to purchase

26  various items through the inmate's account.  DUF #61.  In 2009 the commissary was operated by

1   an outside vendor, Aramark Correctional Services.  DUF #62

2          Plaintiff states that at Coalinga State Hospital clean bedding, clothing and towels

3   were provided daily, but this was not the case at SCMJ.  DUF #141.  All prisoners at SCMJ were

4   allowed to exchange clothing bedding and linens with the same frequency.  Doc. 72, Decl. of

5   Daw ¶ 46.  Outer garments, bedding and linens could be exchanged for clean items once per

6   week.  Id.  Undergarments could be exchanged twice per week.  Id.  Though, inmate workers

7   were permitted to exchange laundry more often as they are required to maintain certain standards

8   for their jobs.  Id.

9          Plaintiff would have preferred to be kept entirely separate from all criminal

10  prisoners.  DUF #142.  Plaintiff came into occasional contact with criminal prisoners who were

11  given extra responsibilities and allowed to have jobs such as distributing meals, cleaning the jail,

12  and exchanging clean and dirty laundry.  DUF #143.  Plaintiff concedes that other than contact

13  with the workers, contact with other criminal prisoners was accidental.  DUF #147; Plaintiff's

14  Undisputed Facts (PUF) #147.

15         Plaintiff states he was unable to call toll free numbers on the jail phone.  DUF

16  #148.  Plaintiff could not use the prepaid telephone system at the jail because he did not have

17  sufficient money.  DUF #149.  Telephone calls from SCMJ can be monitored, though it is not

18  clear if any of plaintiff's phone calls were monitored.  DUF #150.  Mail may be read at SCMJ,

19  though it is not clear if plaintiff's mail was read.  DUF #151.

20         Due to safety and security reasons, including preventing contraband from entering

21  SCMJ, all visitation takes place through a glass wall which separates the inmate from the visitor.

22  DUF #66.  Plaintiff received fourteen social visits during his time at SCMJ.  DUF #152.  Plaintiff

23  states that his sister received two parking tickets while visiting him.  DUF #154.  Authorities at

24  SCMJ are not responsible for parking enforcement around the jail.  DUF #155.

25         On June 12, 2009, plaintiff's cell was searched and plaintiff was subject to a pat-

26  down search and had to remove his shoes.  DUF #156.  All of plaintiff's property was returned.

1    Id. No more than six prisoners are permitted in the law library at one time.  DUF #159.  Plaintiff

2    made nine requests to use the law library.  DUF #157.  Plaintiff was allowed to use the law

3    library on at least four separate occasions.  DUF #158.

4                        Disputed Facts

5                        Plaintiff generally states that his conditions were too restrictive considering his

6    status as a civil detainee.

7            Analysis

8                        Legal Standard

9                        As a civil detainee, the applicable standard for plaintiff is not the more restrictive

10   standards for cruel and unusual punishment under the Eighth Amendment; rather, "'the more

11   protective fourteenth amendment standard applies to conditions of confinement when detainees

12   ... have not been convicted' of a crime."  Jones v. Blanas, 393 F.3d 918, 931 (9th Cir. 2004),

13   quoting Gary H. v. Hegstrom, 831 F.2d 1430, 1432 (9th Cir. 1987), citing Youngberg v. Romeo,

14   457 U.S. 307, 102 S. Ct. 2452 (1982) (civilly committed individuals), and Bell v. Wolfish, 441

15   U.S. 520, 99 S. Ct. 1861 (1979).

16                        The Fourteenth Amendment requires the government to do more
                         than provide the "minimal civilized measure of life's necessities,"
17                        Rhodes [v. Chapman], 452 U.S. [337] at 347, 101 S.Ct. 2392, for
                         non-convicted detainees. Rather, "due process requires that the
18                        nature and duration of commitment bear some reasonable relation
                         to the purpose for which the individual is committed." Jackson v.
19                        Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845 [] (1972).

20                        The case of the individual confined awaiting civil commitment
                         proceedings implicates the intersection between two distinct
21                        Fourteenth Amendment imperatives. First, "[p]ersons who have
                         been involuntarily committed are entitled to more considerate
22                        treatment and conditions of confinement than criminals whose
                         conditions of confinement are designed to punish." Youngberg,
23                        457 U.S. at 321-22, 102 S.Ct. 2452.  Second, when the state
                         detains an individual on a criminal charge, that person, unlike a
24                        criminal convict, "may not be punished prior to an adjudication of
                         guilt in accordance with due process of law.'" Bell, 441 U.S. at
25                        535, 99 S.Ct. 1861 (emphasis added); see also Demery v. Arpaio,
                         378 F.3d 1020, 1029 (9th Cir.2004) ("[T]he Fourteenth
26                        Amendment prohibits all punishment of pretrial detainees.").  As

1   civil detainees retain greater liberty protections than individuals
    detained under criminal process, see Youngberg, 457 U.S. at 321-
2   24, 102 S.Ct. 2452, and pre-adjudication detainees retain greater
    liberty protections than convicted ones, see Bell, 441 U.S. at 535-
3   36, 99 S.Ct. 1861, it stands to reason that an individual detained
    awaiting civil commitment proceedings is entitled to protections at
4   least as great as those afforded to a civilly committed individual
    and at least as great as those afforded to an individual accused but
5   not convicted of a crime.

6   Jones v. Blanas, 393 F.3d at 931-932.

7          In Jones v. Blanas, where the plaintiff was, like plaintiff herein, an individual

8   detained in a county jail awaiting involuntary civil commitment proceedings under the SVPA, the

9   Ninth Circuit found "that the conditions of confinement for an individual detained under civil

10  process but not yet committed must be tested by a standard at least as solicitous to the rights of

11  the detainee as the standards applied to a civilly committed individual and to an individual

12  accused but not convicted of a crime." Id., at 932.

13         While the Jones Court noted that the Eleventh Circuit[3] has gone so far as to hold

14  that it is unconstitutional for individuals awaiting involuntary civil commitment proceedings to

15  be held in jail at all, the Ninth Circuit did not venture so far, but asserted that "[a]t a bare

16  minimum," such an individual cannot be subjected to conditions amounting to punishment. Id.,

17  at 932 [citations omitted].

18         Because a person detained pending confinement under the SVPA is a civil

19  detainee, "an SVPA detainee is entitled to 'more considerate treatment' than his criminally

20  detained counterparts." Id., citing Youngberg, 457 U.S. at 321-22. "[W]hen a SVPA detainee is

21  confined in conditions identical to, similar to, or more restrictive than, those in which his

22  criminal counterparts are held, we presume that the detainee is being subjected to 'punishment.'"

23  Id., citing Sharp v. Weston, 233 F.3d 1166, 1172-73 (9th Cir. 2000) (Youngberg required that

24  those civilly confined at a commitment center must receive "more considerate" treatment than

25

26         [3] See Lynch v. Baxley, 744 F.2d 1452 (11th Cir. 1984).

inmates at a correctional center where the commitment center was located).

> In sum, a civil detainee awaiting adjudication is entitled to conditions of confinement that are not punitive. Under Bell and our circuit precedent, a restriction is "punitive" where it is intended to punish, or where it is "excessive in relation to [its non-punitive] purpose," Demery, 378 F.3d at 1028..., or is "employed to achieve objectives that could be accomplished in so many alternative and less harsh methods," Hallstrom, 991 F.2d at 1484.... With respect to an individual confined awaiting adjudication under civil process, a presumption of punitive conditions arises where the individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held, or where the individual is detained under conditions more restrictive than those he or she would face upon commitment. Finally, to prevail on a Fourteenth Amendment claim regarding conditions of confinement, the confined individual need not prove "deliberate indifference" on the part of government officials.

Jones v. Blanas, 393 F.3d at 933-34.

However, if a particular condition or restriction is "reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" Bell, 441 U.S. at 539.  Defendants must be afforded an opportunity to demonstrate legitimate, non-punitive interests justifying the conditions of detainees awaiting SVPA proceedings, and by showing that the restrictions imposed on such detainees were not excessive in relation to these interests.  Jones, 393 F.3d at 934–35.  Legitimate non-punitive governmental objectives include 'maintaining security and order' and 'operating the [detention facility] in a manageable fashion.'" Pierce v. County of Orange, 526 F.3d 1190, 1205 (9th Cir. 2008) (quoting Bell, 441 U.S. at 540 n. 23).

Discussion[4]

This court notes that there is a lack of guidance on what constitutes punitive confinement in these types of cases.  The Ninth Circuit was clear that unlike the Eleventh Circuit,

---

[4] Defendant has filed a list of 108 individual objections to plaintiff's evidence and exhibits.  As plaintiff is proceeding pro se, all 108 objections will be overruled and the court will review all of plaintiff's evidence and exhibits.

it is not unconstitutional for individuals waiting involuntary civil commitment proceedings to be held in jail with criminal prisoner and detainees.  Thus, detainees and prisoners are at times held in the same facilities, but the treatment of detainees must not be punitive or restrictive and they must receive more considerate treatment.  However, there is little case law defining restrictive and considerate.

The Ninth Circuit stated in <u>Hydrick v. Hunter</u>, 500 F.3d 978 (9th Cir. 2007), rev'd in part on other grounds, that "[w]e acknowledge at the outset that it is not always clearly established how much more expansive the rights of civilly detained persons are than those of criminally detained persons.  As discussed below, the rights afforded civilly detained persons are flexible enough to take into account the circumstances of detention.  The law generally requires a careful balancing of the rights of individuals who are detained for treatment, not punishment, against the state's interests in institutional security and the safety of those housed at the facility. [Citations omitted].  <u>Id</u>., at 990.

In the instant case plaintiff has set forth dozens of examples of what he considers to be more restrictive and less considerate treatment, such as having to wear orange clothes, a delay in receiving shower sandals and that some inmates had more benefits than him.  It should also be noted that plaintiff assumes any inmate not at SVP, was a convicted prisoner, when in fact SCMJ holds many pre-trial detainees.  Therefore, plaintiff's assertions that he was being treated the same as criminal prisoners is flawed as many of these people were pre-trial detainees similarly situated to plaintiff.  Regardless, the court will address the claims below.

<u>Transportation to SCMJ</u>

In his opposition to summary judgment, plaintiff concedes that his claim regarding the use of restraints during transportation is untenable.  Opposition at 77.[5]  When plaintiff was transported he was allowed to bring a bag containing fourteen Efferdent tablets, a

---

[5] While plaintiff does state that defendant could have used soft restraints, plaintiff does not present this as a claim.

1  carry see-through bag, eyeglass case, electronic dictionary, wrist watch and state issued velcro

2  strap shoes.  Plaintiff states he was not allowed to bring his Apple iPod, DVD player, Palm PDA

3  and wireless keyboard, Play Station Portable gaming device, DVDs, CDs, SD chips, thumb

4  drives, pens, photo albums, personal food and shoes.  Plaintiff also alleges that his staples and

5  metal paperclips were confiscated.  Yet, all of plaintiff's electronics he was not allowed to bring

6  to SCMJ remained at Coalinga State Hospital and were returned to him.

7           Plaintiff has a protected interest in his personal property.  Hansen v. May, 502

8  F.2d 728, 730 (9th Cir. 1974).  In this context, the Due Process Clause protects prisoners from

9  being deprived of their property without due process of law.  Wolff v. McDonnell, 418 U.S. 539,

10  556, 94 S.Ct. 2963 (1974).  However, while an authorized, intentional deprivation of property is

11  actionable under the Due Process Clause, neither negligent or "unauthorized intentional

12  deprivations of property gives rise to a violation of the Due Process Clause if the state provides

13  an adequate post-deprivation remedy."  Hudson v. Palmer, 468 U.S. 517, 533 n. 14, 104 S.Ct.

14  3194 (1983).  California provides an adequate post-deprivation remedy that can provide

15  compensation for property loss.  See Barnett v. Centoni, 31 F.3d 813, 816–17 (9th Cir. 1994)

16  (California law provides an adequate post-deprivation remedy for any property deprivations.  See

17  Cal. Gov't.Code §§ 810–895).  In other words, only an authorized intentional deprivation of

18  property is actionable under the Due Process Clause.  Authorized deprivations of property are

19  permissible if carried out pursuant to a regulation that is reasonably related to a legitimate

20  penological interest.  Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254 (1987).

21           In the instant case it appears that the transporting officers made a decision that

22  plaintiff could not bring his DVD player, I-Pod and other assorted electronics, but this property

23  was not confiscated as plaintiff states he packed it up in a storage bin and later returned to him.

24  Doc. 73, Exh. A: Plaintiff's Deposition at 45, 190.  This fails to state a constitutional claim as

25  this was not punitive action, nor does the removal of metal paperclips and staples warrant further

26  discussion.

1    Booking Process

2    Plaintiff states that being booked in SCMJ under Penal Code § 2620 violated the

3    Fourteenth Amendment.  California Penal Code § 2620 states:

> When it is necessary to have a person imprisoned in the state
> prison brought before any court to be tried for a felony, or for an
> examination before a grand jury or magistrate preliminary to such
> trial, or for the purpose of hearing a motion or other proceeding, to
> vacate a judgment, an order for the prisoner's temporary removal
> from said prison, and for the prisoner's production before such
> court, grand jury or magistrate, must be made by the superior court
> of the county in which said action, motion, or examination is
> pending or by a judge thereof; such order shall be made only upon
> the affidavit of the district attorney or defense attorney, stating the
> purpose for which said person is to be brought before the court,
> grand jury or magistrate or upon the court's own motion. The order
> shall be executed by the sheriff of the county in which it shall be
> made, whose duty it shall be to bring the prisoner before the proper
> court, grand jury or magistrate, to safely keep the prisoner, and
> when the prisoner's presence is no longer required to return the
> prisoner to the prison from whence the prisoner was taken; the
> expense of executing such order shall be a proper charge against,
> and shall be paid by, the county in which the order shall be made.

14    Plaintiff objects as the code refers to the person as a "prisoner" and plaintiff was

15   not a prisoner.  As this only appeared on plaintiff's paperwork, there was no punitive effect on

16   plaintiff and no intent from defendant.

17    Plaintiff also states that being issued orange clothing similar to criminal prisoners

18   was a constitutional violation as he appeared to be a prisoner.  Yet, there is no evidence that

19   plaintiff being required to wear the same color clothing as prisoners was done for punitive

20   reasons.  Defendants note that most inmates are given the same color for simplicity and safety.

21   Defendants also contend, and it is undisputed and generally known that SVP detainees or other

22   inmates who have a criminal history of sex and violence against children are likely to be targeted

23   by other inmates.  It seems a wise safety measure that SVP detainees are not singled out and

24   identified with different color clothing.  Summary judgment is granted for defendant on this

25   claim.

26   \\\\\

16

1    Plaintiff also objects to the strip search he endured when he was booked into

2  SCMJ.  It is undisputed that it was only a visual search.  The Fourth Amendment right to be

3  secure against unreasonable searches and seizures extends to detainees who are sexually violent

4  predators.  Hydrick v. Hunter, 500 F.3d 978, 993 (9th Cir. 2007), rev'd in part on other grounds.

5  The test of "reasonableness" under the Fourth Amendment requires the court to "consider the

6  scope of the particular intrusion, the manner in which it is conducted, the justification for

7  initiating it, and the place in which it is conducted."  Bell, 411 U.S. at 559.

8    In recently ruling on the propriety of strip searches for pretrial detainees, indeed, a

9  detainee who was being held for a traffic law violation, the Supreme Court held that strip

10  searches in county jail facilities were not unconstitutional.  Florence v. Brd. of Chosen

11  Freeholders etc., __U.S.__, 132 S.Ct. 1510 (2012).  That rule of law decides this case as plaintiff

12  would have no greater rights than a pretrial detainee in respect to searches in the jail facility.[6]

13    Cell

14    Plaintiff also alleges Fourteenth Amendment violation with respect to many

15  aspects of his cell, in that he was forced to share the cell with another SVP detainee.  As a result,

16  plaintiff alleges he was forced to endure the smell of his cell mate defecating, the sound of him

17  masturbating, and noises from other detainees housed in other cells nearby.

18  \\\\\

19

20  [6]The court does not find that Florence can be distinguished on the basis  that plaintiff,
who has sometimes contact with other "prisoners" in the jail, prisoners which include pretrial
detainees and convicted misdemeanants (and now felons transferred under the recent prison
21  overcrowding realignment procedures in California) is not part of the "general population" of the
Sacramento County Jail, as for the most part, he is kept separate from other non-special needs
22  inmates.  As plaintiff complains, his conditions of confinement cannot be differentiated from the
run of the mill detainee who is routinely strip searched in the jail upon entry to that facility.
23  More importantly, plaintiff does not offer any persuasive argument that he should be considered
less of a security risk than a pretrial detainee, e.g., it is commonly known that
24  prisoners/committees from state institutions can craft ingenious weapons, or have access to
unlawful drugs, which they also ingeniously hide.  Plaintiff does not alleges that he is not subject
25  to strip searches at his primary institution; indeed he alludes to such a search when transferred
from Coalinga.  Why would it be any different when he is transferred to another institution
26  temporarily?

1    However, plaintiff's assertions that sharing a cell with only one other person and

2    that there were other cells nearby, do not rise to the level of a harm or disability with which the

3    constitution is concerned.  See Bell, 441 U.S. at 539, n. 21, 99 S.Ct. 1861 ("There is, of course, a

4    de minimis level of imposition with which the Constitution is not concerned.").  Some crowding

5    and loss of freedom of movement is one of the inherent discomforts of confinement.  Id. at 537;

6    see also Demery v. Arpaio, 378 F.3d 1020, 1030 (noting that Bell determined that "the additional

7    discomfort of having to share the already close corners with another detainee was not sufficiently

8    great to constitute punishment.").  Even if having one cell mate and other cells nearby were to

9    constitute more than de minimis harm, there is no evidence that the condition was intended to

10   punish or was excessive in relation to a non-punitive purpose.[7]

11   Plaintiff also raises a claim regarding when jail officials searched his cell on one

12   occasion and conducted a limited pat down search.  It is undisputed that all of plaintiff's property

13   was returned after the search.  However, a civil detainee has no reasonable expectation of privacy

14   in his jail cell.  See Mitchell v. Nupnik, 75 F.3d 517, 522 (9th Cir. 1996).  Moreover, for the

15   same reasons discussed above, defendant has demonstrated a legitimate penological interest in

16   restricting contraband, and plaintiff has failed to present evidence that one cell search and a

17   limited pat down were punitive.

18      Jail Life

19   Plaintiff was housed at SCMJ for 126 days, and it is undisputed that during that

20   time, he had 161 opportunities for dayroom time, which were offered on 111 days of his stay and

21   plaintiff received an average of 92 minutes per dayroom opportunity.  It is also undisputed that

22   criminal defendants received 161 opportunities for dayroom, but these were only offered on 106

23   days and had an average of 82 minutes per dayroom opportunity.  It is also undisputed that

24

25      [7] It also appears that plaintiff has conceded that summary judgment should be granted on
     this claim, though plaintiff does note that other county jails have single cells for SVP inmates.
26   Opposition at 62.

18

1    plaintiff was given 28 opportunities for outdoor recreation, which were offered on 26 days of his

2    incarceration and plaintiff received an average of 88 minutes of outdoor recreation per

3    opportunity.  Criminal inmates received 31 opportunities for outdoor recreation, on 30 different

4    days, but criminal inmates received only 62 minutes of outdoor recreation time.

5           As with the majority of plaintiff's claims, he simply argues that he should have

6    received more outside time and dayroom time, similar to his privileges at Coalinga State

7    Hospital.  That SCMJ offers less recreation time is not a per se constitutional violation, as

8    plaintiff contends.  As described above, there is no set formula on how many more benefits a

9    detainee is entitled to versus a prisoner.  The Ninth Circuit made clear that SVP detainees can be

10   housed with prisoners as long as they are not subjected to punitive conditions.  With respect to

11   dayroom and outside time there is little guidance on how little is punitive and how much more

12   detainees are entitled to versus prisoners.  It is undisputed that SCMJ holds a wide variety of

13   detainees and prisoners, numbering more than two thousand, and all must have access to the

14   dayroom and outside recreation, thus plaintiff is not entitled to an unlimited amount of time.

15          Exercise is one of the basic human necessities protected by the Eighth

16   Amendment.  Hearns v. Terhune, 413 F.3d 1036, 1042 (9th Cir. 2005).  Moreover, the

17   Fourteenth Amendment requires that pre-trial detainees not be denied adequate opportunities for

18   exercise without legitimate governmental objectives.  See also Pierce v. County of Orange, 526

19   F.3d 1190, 1211–12 (9th Cir. 2008).

20          Although the Ninth Circuit did not specify the "minimum amount of weekly

21   exercise that must be afforded to detainees who spend the bulk of their time inside their cells,"

22   the Court held that ninety minutes per week of exercise, which is the equivalent of less than

23   thirteen minutes per day, does not comport with Eighth Amendment standards.  Pierce, 526 F.3d

24   at 1212 (9th Cir. 2008).  The Pierce court eventually required that if detainees spent 22 hours per

25   day in their cells, that they then be provided with at least two hours of exercise per week.  Id. at

26   1213.

1    In the instant case, with respect the amount of dayroom time, 111 days of his 126

2  days on 161 occasions with an average of 92 minutes each is sufficient for a range of activities

3  including recreation.  In addition to all of the inside time, plaintiff was provided with 28

4  opportunities for outdoor recreation, which were offered on 26 days of his incarceration and

5  plaintiff received an average of 88 minutes of outdoor recreation per opportunity.  Plaintiff spent

6  approximately 18 weeks at SCMJ and in that time he received approximately thirteen hours a

7  week of indoor time and approximately two hours a week of outdoor time.  This is sufficient and

8  there are no indications that defendant had a punitive intent, especially as so many inmates were

9  also vying for recreation time.[8]

10    Plaintiff made nine requests for law library access, and was provided access on

11  four occasions.  Plaintiff argues that other facilities provide more access to the law library for

12  SVP detainees.  Plaintiff also argues because there were close to 2,400 prisoners and only

13  approximately 6 SVP inmates, criminal prisoners were provided more access.  Plaintiff has failed

14  to demonstrate that his limited law library access was punitive in nature.  Defendant notes that all

15  2,400 inmates must be provided access to the law library, and as already noted SVP inmates are

16  kept separate from other inmates, therefore, plaintiff could not be provided unlimited access to

17  the law library.  While it is possible plaintiff could have been provided more access to the law

18  library, that would have involved plaintiff interacting with criminal prisoners, which plaintiff

19  states would be a violation of his constitutional rights and defendant notes could be dangerous.

20    Nor has plaintiff presented a viable claim for denial of access to the courts.

21  Prisoners have a constitutional right to be afforded "a reasonably adequate opportunity to present

22  claimed violations of fundamental constitutional rights to the courts."  Lewis v. Casey, 518 U.S.

23

24    [8] In his opposition to summary judgment plaintiff argues that the numbers provided by defendant are misleading because it only compares SVP detainees with criminal inmates in the 300 area of the jail, while inmates in the 100 and 200 area were provided more recreation than plaintiff.  In his reply (Doc. 87), defendant supplies average times for the 100 and 200 area inmates and has demonstrated that plaintiff was provided more recreation time than these inmates as well.

25

26

1  343, 351, 116 S.Ct. 2174 (1996).  This right applies to prisoners' challenges to their convictions

2  or sentences or conditions of confinement.  Id. at 354.  Prison officials may not "actively

3  interfer[e] with inmates' attempts to prepare legal documents or file them."  Id. at 350.  To

4  establish a claim for any violation of the right of access to the courts, prisoners must prove an

5  actual injury by showing that their efforts to pursue a non-frivolous claim concerning their

6  conviction or conditions of confinement has been hindered.  Id. at 350-55.

7              Plaintiff filed a case in Sacramento County Superior Court challenging the

8  conditions of confinement at SCMJ.  Doc. 84, Declaration Part 2, Exh. D.  That court denied the

9  case as moot as plaintiff had been transferred back to Coalinga State Hospital.  Plaintiff does not

10  describe the claims in that case nor does he provide specific details on how he was denied access

11  to the court, simply stating that only being provided access to the law library on four occasions

12  delayed the filing of his case.  This is insufficient to overcome summary judgment.  Moreover,  it

13  seems that even if plaintiff had been provided unlimited access to the law library the state court

14  action would still have been denied as moot.

15              It is undisputed that all prisoners at SCMJ were allowed to exchange clothing,

16  bedding and linens with the same frequency.  Outer garments, bedding and linens could be

17  exchanged for clean items once per week.  Undergarments could be exchanged twice per week.

18  Though, inmate workers were permitted to exchange laundry more often as they are required to

19  maintain certain standards for their jobs.[9]

20              The constitution imposes a duty on jail officials to ensure that detainees are

21  provided adequate clothing, bedding, and sanitation.  See Farmer v. Brennan, 511 U.S. 825, 832,

22  114 S.Ct. 1970 (1994); Touissant v. McCarthy, 597 F.Supp. 1388, 1410-11 (N.D.Cal.1984), rev'd

23  in part on other grounds, 801 F.2d 1080 (9th Cir. 1986) (holding jail officials "under an

24  obligation to ensure that ... clothing ... is adequately laundered" and that bedding is "reasonably

25  _____

26  [9] Plaintiff does not state he wanted to be an inmate worker, rather they received extra
benefits for their jobs that he did not.

1   clean [and] sanitary" and the Eighth Amendment is violated when weeks and months pass

2   without a clothing exchange).  It is clear from the record that plaintiff was provided clean clothes

3   in a timely manner and there were legitimate reasons why some other prisoners received clean

4   clothing more regularly.  Summary judgment is granted as desiring cleaner clothes more often

5   does not present a constitutional claim.

6          In the complaint, plaintiff states he was denied the right to confidential mail,

7   outgoing mail could not be sealed and mail was read by jail staff, though he provides no evidence

8   in support for this last claim.  It is undisputed that there was no restrictions on the amount of mail

9   plaintiff could send.  In his opposition to summary judgment plaintiff only argues that at

10  Coalinga State Hospital he was allowed to seal his envelopes prior to mailing, but was not

11  allowed to do this at SCMJ.

12         Prisoners and civilly committed persons have a First Amendment right to send

13  and receive mail.  Robinson v. Joya, 2010 WL 890437, at *6 (E.D. Cal. 2010) (citing

14  Thornburgh v. Abbott, 490 U.S. 401, 407, 109 S.Ct. 1874 (1989)); see also Valdez v.

15  Rosenbaum, 302 F.3d 1039, 1048 (9th Cir. 2002).  Restrictions on prisoners' mail are analyzed

16  under the reasonableness standard set forth in Turner v. Safley, 482 U.S. 78,89–91, 107 S.Ct.

17  2254 (1987).  "Interference is valid if it is reasonably related to legitimate penological interests."

18  Safley, 482 U.S. at 89.  For a civil detainee, "any restrictions on his First Amendment rights to

19  send and receive mail must be non-punitive."  Robinson, 2010 WL 890437, at *7 (citing

20  Hydrick, 500 F.3d at 989; Jones, 393 F.3d at 932).  To show that restrictions are punitive, a

21  plaintiff must show "that the challenged restrictions are expressly intended to punish, the

22  restrictions serve a non-punitive purpose but are nonetheless excessive, or that the legitimate

23  purpose could be accomplished with less restrictive or harsh methods."  Id. (citing Jones, 393

24  F.3d at 932; Bell, 441 U.S. at 539).  Plaintiff has failed to show that not being allowed to seal his

25  envelopes was a restriction let alone punitive.

26  \\\\\

1    It is undisputed that plaintiff received fourteen visits during his time at SCMJ.

2    SCMJ regulations provide that pre-trial detainees are allowed two sixty minute visits per week,

3    while sentenced prisoners may receive three forty-five minute visits per week.  There are no

4    specific regulations for SVP detainees.  Plaintiff argues that he was only allowed two visits per

5    week, while sentenced prisoners were allowed three visits per week, therefore he received less

6    considerate treatment.  Defendant does not dispute that sentenced prisoners are allowed more

7    visits than pre-trial detainees, but note that there are no specific regulations for SVP detainees

8    and plaintiff has presented no evidence or even argued that he requested more visits which were

9    denied.  Plaintiff only argues that his family was dissuaded from further visits due to parking

10   tickets and having to wait to see plaintiff.  Plaintiff notes that his visitors had to wait if there

11   were criminal prisoners having visits, ostensibly so plaintiff would not come into contact with

12   these criminal prisoners.  Plaintiff also objects to the visits being in between a glass wall.

13   Inmates and by extension civil detainees have the right to communicate with

14   people outside the jail.  Valdez v. Rosenbaum, 302 F.3d 1039, 1048 (9th Cir. 2002).  Pretrial

15   detainees do not have a right to unfettered visitation.  See Block v. Rutherford, 468 U.S. 576,

16   585–89, 104 S.Ct. 3227 (1984) (upholding a blanket prohibition on contact visitation for pretrial

17   criminal detainees as reasonably related to a legitimate government interest in security).  At a

18   minimum, SVP's must be afforded the same rights afforded prisoners confined in a penal

19   institution.  Hydrick v. Hunter, 500 F.3d 978, 998 (9th Cir. 2007).  However, many liberties and

20   privileges enjoyed by other citizens must be surrendered when one is rightfully incarcerated,

21   either as an inmate or an SVP.  See Overton v. Bazzetta, 539 U.S. 126, 131, 123 S.Ct. 2162

22   (2001).  Put simply, "[a] n inmate does not retain rights inconsistent with proper incarceration."

23   Id.

24   It is undisputed that plaintiff had fourteen visits in the approximately eighteen

25   weeks he was SCMJ.  Plaintiff presents no evidence or arguments that defendant denied

26   additional visits.  Plaintiff contends that at Coalinga State Hospital he could have visitors every

23

day, though that is immaterial.  Plaintiff also argues that jail regulations only allow him two

visits per week, while prisoners can have three visits a week.  Defendant notes that plaintiff was

not restricted to two visits a week and never requested additional visits.  Even if plaintiff had

been restricted to two visits per week, he would have been entitled to thirty-six visits, but still

only received fourteen, so defendant cannot be faulted for people not visiting plaintiff.  Had

plaintiff requested more visits that were denied by defendant, while convicted prisoners were

allowed more visits, there could perhaps be a claim, but that has not been articulated in this case.

The facts and claim presented by plaintiff do not present a constitutional violation.  Defendant

has also provided a legitimate non punitive reason for having visits occur between glass, to

insure the safety of the entire facility.  Summary judgment should therefore be granted on this

claim.

Plaintiff's claims regarding the telephone use are difficult to discern.  To the

extent that plaintiff did not have the funds to buy a calling card, this fails to set forth a cognizable

claim and in his opposition to summary judgment plaintiff withdraws his claim that his calls to

his attorney were monitored.  Opposition at 75.  That the outside vendor, Global Tel-Link did not

accept plaintiff's prepaid calling card, also fails to set forth a Fourteenth Amendment violation.

Plaintiff also states he did not receive a rule book when he went through the

booking process and he did not receive one until August 10, 2010, though plaintiff admits he did

not request a rule book during booking.  It is undisputed that staff at SCMJ performed head

counts and on many occasions plaintiff had to either stand up or sit down so staff could count

him.  Plaintiff states that for some meals, certain components of the meal were no longer

available by the time he received the meal, such as milk, a piece of fruit or a Kool-Aid packet.

Plaintiff believes this occurred about three meals per week.  Plaintiff believes the SCMJ

commissary is more expensive than at Coalinga State Hospital, though it is undisputed that the

commissary was operated by an outside vendor, Aramark Correctional Services, that is not a

party to this action.  Plaintiff also states that people who visited sometimes received parking

tickets.  At Coalinga State Hospital plaintiff states he was provided with sheets, pillow cases,

pillows and pillow wedges, however at SCMJ he was only provided with two thin blankets.

Plaintiff does not allege he was cold or needed heavier blankets, just that there were more

amenities at Coalinga State Hospital.  Plaintiff also states he had to wait eleven days before he

received shower sandals.[10]  None of these allegations demonstrate any punitive action against

plaintiff and are far too insignificant to warrant a discussion of a constitutional violation,

therefore summary judgment is granted.

### Medical Care

Plaintiff states that the medical care he received was inadequate.  Plaintiff

contends he only received limited doses of his medication for psoriasis, though he does not

provide more details, and no medication for psoriasis the first three days.[11]  Plaintiff also states

some medications were substituted for other others, but the only example he provides is that his

calcium supplements were replaced with TUMS.

As a civil detainee, plaintiff's right to medical care is protected by the substantive

component of the Due Process Clause of the Fourteenth Amendment.  See Youngberg v. Romeo,

457 U.S. 307, 315, 102 S.Ct. 2452 (1982).  Under this provision of the constitution, plaintiff is

"entitled to more considerate treatment and conditions of confinement than criminals whose

conditions of confinement are designed to punish." Jones v. Blanas, 393 F.3d 918, 931 (9th Cir.

2004) (quoting Youngberg, 457 U.S. at 321–22); cf. Clouthier v. County of Contra Costa, 591

F.3d 1232, 1243–44 (9th Cir. 2010) (pretrial detainees, who are confined to ensure their presence

at trial and are therefore not similarly situated to those civilly committed, are afforded only those

protections provided by the Eighth Amendment).  Thus, to avoid liability, defendant's medical

decisions regarding plaintiff's treatment must be supported by "professional judgment."

[10] While plaintiff states he did contract athletes foot, he provides no other details
regarding a medical problem or any punitive actions or intent by defendant.

[11] It appears the medication included a cream and a shampoo.

1   Youngberg, 457 U.S. at 321.  A defendant fails to use professional judgment when her decision

2   is "such a substantial departure from accepted professional judgment, practice, or standards as to

3   demonstrate that [she] did not base [her] decision on such a judgment."  Id. at 323.

4          In determining whether defendant has met his constitutional obligations, decisions

5   made by the appropriate professional are entitled to a presumption of correctness.  Youngberg,

6   457 U.S. at 324.  "[T]he Constitution only requires that the courts make certain that professional

7   judgment in fact was exercised.  It is not appropriate for the courts to specify which of several

8   professionally acceptable choices should have been made."  Id. at 321.  Liability will be imposed

9   only when the medical decision "is such a substantial departure from accepted professional

10  judgment, practice, or standards as to demonstrate that the person responsible actually did not

11  base the decision on such a judgment."  Id. at 323.

12         Plaintiff has failed to demonstrate that not receiving his psoriasis medication for

13  the first three days was a substantial departure from accepted professional judgment nor has

14  plaintiff expanded on his allegation that he received only a limited dose of other medication or

15  the substitution of medications.  Based on the facts and arguments set forth in the instant motion,

16  summary judgment is granted for defendant.

17                    Mental Health

18         It is undisputed that psychiatric treatment is available to all inmates at SCMJ,

19  including individual and group counseling.  Though plaintiff was unable to continue with the

20  formal Sex Offender Commitment Program (SOCP), that he had been involved with at Coalinga

21  State Hospital.  The SOCP is comprised of multiple components including group therapy, daily

22  journaling, an empathy book, assessments and 24 hour behavior monitoring.  Plaintiff did not

23  participate in any other group therapy at SCMJ nor did he continue daily journaling.  Though

24  plaintiff did keep a journal unrelated to his SOCP treatment.  Plaintiff was not aware of any

25  mental health assessments that he missed at Coalinga State Hospital while he was at SCMJ.

26  \\\\\

1          The main thrust of plaintiff's claim is that he was unable to continue the formal

2    SOCP that he had previously participated in.  However, it is undisputed that plaintiff could have

3    continued to keep a journal similar to the SOCP, but he chose not to.  Plaintiff states he was

4    never permitted to participate in counseling, though plaintiff provides no evidence that he

5    requested counseling nor does he even present an argument that he requested counseling that was

6    denied.  Plaintiff simply states that he requested SOCP which was denied.  It is clear that many of

7    the components of SOCP were provided by defendant, but plaintiff chose not to participate.

8    Thus, summary judgment should be granted as there is no evidence of punitive conduct by

9    defendant.

10                          Interaction with Criminal Prisoners

11         Plaintiff states that his rights were violated as he occasionally interacted with

12   criminal prisoners.  Plaintiff may have been near criminal prisoners when he was booked,

13   plaintiff was placed in a cell with a criminal prisoner for five hours, certain criminal prisoners

14   were given extra responsibilities and served meals and gave clean laundry to plaintiff or were

15   cleaning the facility near him.  Any other interaction with criminal prisoners was purely

16   accidental.  It is undisputed that plaintiff was never harmed and there are no allegations of any

17   threats against plaintiff.

18         Plaintiff's right to be protected and confined in a safe institution are clearly

19   established.  See Youngberg, 457 U.S. at 319–322 (stating that individuals who are involuntarily

20   civilly committed have constitutionally protected rights under the Due Process Clause to

21   reasonably safe conditions of confinement and freedom from unreasonable bodily restraints).

22   The right is clearly established for civilly committed persons and prisoners alike.  See Farmer v.

23   Brennan, 511 U.S. 825, 833, 114 S.Ct. 1970 (1994); Neely v. Feinstein, 50 F.3d 1502, 1508 (9th

24   Cir. 1995) (finding "clearly established" that patients have a "constitutional right to be safe in the

25   state institutions to which they are committed."), rev'd. in part on other grounds.

26   \\\\\

1   In this instant case it is undisputed that plaintiff was never harmed or even

2   threatened, rather plaintiff occasionally interacted with criminal prisoners.  As plaintiff suffered

3   no harm, summary judgment is granted to defendant.

4   Equal Protection

5   Summary judgment should also be granted for plaintiff's Equal Protection claim.

6   Plaintiff concedes that all SVP inmates at SCMJ were treated the same, rather he argues that SVP

7   inmates at other facilities are treated better, therefore plaintiff opposes summary judgment and

8   requests discovery be reopened to further support this claim.

9   Since this action does not involve a suspect classification, plaintiff may establish

10   an Equal Protection claim by showing that similarly situated individuals were intentionally

11   treated differently without a rational relationship to a legitimate state purpose.  Engquist v.

12   Oregon Department of Agriculture, 553 U.S. 591, 601–02, 128 S.Ct. 2146 (2008).  To survive

13   summary judgment plaintiff must articulate who he is similarly situated to and how they are

14   similar in order for disparate treatment to equate to a violation of his rights to equal protection.

15   See McCollum v. California Dept. Of Corrections and Rehabilitation, 647 F.3d 870, 880–81 (9th

16   Cir. 2011).  Even assuming if SVP inmates at other jails did have single cells or extra recreation,

17   this fails to raise a viable Equal Protection claim as these parties are not similarly situated to

18   plaintiff and defendant cannot be liable for how others were treated in different facilities where

19   defendant has no authority.  Discovery will not be reopened and summary judgment is granted

20   for this claim.

21   Individual and Municipal Liability

22   As stated above, summary judgment should be granted as to all of plaintiff's

23   claims as there were no constitutional violations.  Even assuming for sake of argument that

24   plaintiff had identified a constitutional violation, plaintiff has failed to link the defendant in this

25   case to any alleged conduct.  Plaintiff brings this action against defendant in his individual and

26   official capacities.  In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege: (1)

1    the violation of a federal constitutional or statutory right; and (2) that the violation was

2    committed by a person acting under the color of state law.  See West v. Atkins, 487 U.S. 42, 48,

3    108 S.Ct. 2250 (1988); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).  An individual

4    defendant is not liable on a civil rights claim unless the facts establish the defendant's personal

5    involvement in the alleged rights deprivation, as there is no respondeat superior liability under

6    section 1983.  Jones, 297 F.3d at 934.  That is, plaintiff may not sue any official on the theory

7    that the official is liable for the unconstitutional conduct of his or her subordinates.  Ashcroft v.

8    Iqbal, 556 U.S. 662, 676, 129 S.Ct. 1937 (2009).

9           Because respondeat superior liability is inapplicable to § 1983 suits, "a plaintiff

10    must plead that each Government-official defendant, through the official's own individual

11    actions, has violated the Constitution."  Id.  To be held liable, "the supervisor need not be directly

12    and personally involved in the same way as are the individual officers who are on the scene

13    inflicting constitutional injury."  Starr v. Baca, 652 F.3d 1202, 1205 (9th Cir. 2011) (quotations

14    omitted).  Supervisors can be held liable for the actions of their subordinates (1) for setting in

15    motion a series of acts by others, or knowingly refusing to terminate a series of acts by others,

16    which they knew or reasonably should have known would cause others to inflict constitutional

17    injury; (2) for culpable action or inaction in training, supervision, or control of subordinates; (3)

18    for acquiescence in a constitutional deprivation by subordinates; or (4) for conduct that shows a

19    "reckless or callous indifference to the rights of others."  Al-Kidd v. Ashcroft, 580 F.3d 949, 965

20    (9th Cir. 2009) (citing Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991) (internal

21    quotation marks omitted)).  Even so, "purpose rather than knowledge" is required to impose

22    liability on a supervisor for discharging responsibilities in a way that may have resulted in

23    constitutional deprivations.  See Iqbal, 556 U.S. at 678 (rejecting claim that supervisor's mere

24    knowledge of subordinate's discriminatory purpose amounts to constitutional violation by

25    supervisor).

26    \\\\\

1    It is undisputed that Sheriff McGinnis is the only named defendant and was not

2   personally involved with any of the allegations.  While plaintiff identified certain other actors in

3   the course of the complaint, plaintiff made a decision not to name those individuals as

4   defendants.  Plaintiff generally asserts that McGinnis as supervisor set into motion these acts and

5   is therefore responsible.  However, as noted above, defendant cannot be held liable simply on a

6   theory of respondeat superior.  Nor is there evidence to show that defendant set into motion these

7   acts or acquiesced to the conduct.  Thus, plaintiff has failed to link McGinnis, in his individual

8   capacity to any of the claims, so summary judgment should be granted.

9    A damages claim against an official capacity defendant is equivalent to a claim

10  against the governmental entity represented by the official capacity defendant.  See Hafer v.

11  Melo, 502 U.S. 21, 25, 112 S.Ct. 358 (1995).  Therefore, plaintiff's damages claim against the

12  sheriff in his official capacity is equivalent to a claim against the county itself.  See Brewster v.

13  Shasta County, 275 F.3d 803, 806-07 (9th Cir. 2001) (County Sheriff represents county, not state,

14  in administering county jail).

15    Municipalities (e.g., the sheriff in his official capacity) and other local government

16  units such as counties are considered "persons" under 42 U.S.C. § 1983 and therefore may be

17  liable for causing a constitutional deprivation.  Monell v. New York City Dep't of Social

18  Services, 436 U.S. 658, 690-91, 98 S.Ct. 2018 (1978).  However, liability under § 1983 only

19  exists if plaintiff shows that his constitutional injury was caused by employees acting pursuant to

20  the municipality's policy or custom.  See Villegas v. Gilroy Garlic Festival Ass'n, 541 F.3d 950,

21  964 (9th Cir. 2008) (citing Monell 436 U.S. at 690–94).  In order for plaintiff to proceed on

22  claims against defendant in his official capacity, plaintiff must show that his specific policies and

23  practices were the moving forces behind the alleged violations of plaintiff's constitutional rights.

24  See Gibson v. County of Washoe, 290 F.3d 1175, 1185–86, 1193–94 (9th Cir. 2002).

25    "[T]here are three ways to show a policy or custom of a municipality: (1) by

26  showing a longstanding practice or custom which constitutes the standard operating procedure of

the local government entity; (2) by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (3) by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." <u>Villegas</u>, 541 F.3d at 964 (internal quotations omitted).

Plaintiff only presents general arguments with regard to a <u>Monell</u> violation, but the lack of any evidence of a constitutional violation, let alone a practice, custom or policy fostering that violation, is fatal to plaintiff's claim.

<u>Remaining Issues</u>

As summary judgment should be granted for defendant on all claims, as plaintiff has failed to demonstrate any constitutional deprivation, the court will not address the issues of punitive damages, Eleventh Amendment immunity or qualified immunity.

<u>*Conclusion*</u>

If plaintiff were to have his way, no jail facility could house him, because it would cease to be a jail, and more like a half-way house.  In order to accommodate plaintiff's request, a special facility within the jail would have to be constructed.  As Justice Kennedy set forth:

> The difficulties of operating a detention center must not be underestimated by the courts.  Jails (in the stricter sense of the term, excluding prison facilities) admit more than 13 million inmates a year. See, e.g., Dept. of Justice, Bureau of Justice Statistics, T. Minton, Jail Inmates at Midyear 2010—Statistical Tables 2 (2011). The largest facilities process hundreds of people every day; smaller jails may be crowded on weekend nights, after a large police operation, or because of detainees arriving from other jurisdictions. Maintaining safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face.

<u>Florence v. Board of Chose Freeholders</u>, 132 S.CT. at 1515.

To complicate matters, the detainees comprise the spectrum of "ordinary joes" who are no different from any of us but for the making of a "little" mistake, to those with whom you would

31

1  not turn your back for a second; from those who have been convicted of misdemeanors to

2  persons awaiting trial in a capital case; from those who have become "sober as a judge" to those

3  who have little sanity remaining.  However, it is not possible to construct a myriad of markedly

4  different conditions of confinement to account for everyone's special make-up.  While the law is

5  clear that pretrial detainees or civil committees cannot be punished awaiting trial or commitment

6  proceedings, jail is not nice and no matter what jail authorities do, a rose by any other name still

7  [feels] the same.  This case present nothing but the ordinary vicissitudes of jail.

8           Accordingly, IT IS HEREBY ORDERED that:

9           1.  Defendant's motion for an extension of time to file a reply (Doc. 85) is

10  granted, and the reply is deemed timely filed:

11           2.  Defendant's motion for summary (Doc. 69) is granted and this case is closed.

12  DATED: August 8, 2012

13

14                                          /s/ Gregory G. Hollows
                           UNITED STATES MAGISTRATE JUDGE

15  GGH: AB
    rain1727.sj

16

17

18

19

20

21

22

23

24

25

26

32